# IN THE SUPERIOR COURT OF DELAWARE

BURTON EVAN BANKS and   )
DAVID MICHAEL BARRETT,   )    CA NO: S21C-11-016 CAK
Trustees of the Burton Evan   )
Banks Revokable Living Trust,   )    NON-ARBITRATION CASE
  )
      Plaintiffs/   )
      Counter Defendants,   )
  )
     v.   )
  )
MELISSA R. SCHROCK,   )
  )
      Defendant/   )
      Counter Plaintiff.   )

Submitted: December 20, 2022
Decided: February 2, 2023

## MEMORANDUM OPINION AND ORDER

Paul G. Enterline, Esquire, 113 S. Race Street, P.O. Box 826, Georgetown, DE 19947, Attorney for Plaintiffs/Counter Defendants.

Melissa R. Schrock, P.O. Box 249, Ocean View, DE 19979, *Pro Se*, Defendant/ Counter Plaintiff.

**KARSNITZ, R.J.**

# DECISION AFTER TRIAL

## I.    FACTUAL BACKGROUND

### A. The Parties and Record Title

The parties have stipulated that Burton Evan Banks and David Michael Barrett, as Trustees of the **Burton Evan Banks Revokable Living Trust ("Plaintiffs")** **are the title** owners of record of tax map parcel number 1-34-12.00-1959.00, also known as lot number two (2), in the subdivision known as Holly Park, in Ocean View, Delaware 19970 (the "Property"). The Property was originally owned by Ralph Banks Sr. ("Banks"), who died on May 5, 2004. His son Burton Evan Banks inherited the Property from his father on April 4, 2005, and he deeded the Property to himself and his co-trustee, David Michael Barrett, on September 21, 2016, as Trustees of the Burton Evan Banks Revokable Living Trust.

The parties have further stipulated that Melissa R. Schrock ("Defendant") is the title owner of record of tax map parcel number 1-34-12.00-1958.00, also known as lot number one (1), in the subdivision known as Holly Park, with an address of 36497 Lisa Avenue, Ocean View, Delaware 19970 ("Lot 1"). On June 18, 2001, Banks sold Lot 1 to Susan Hicks ("Hicks"), Defendant's mother. On January 29, 2016, Hicks deeded an interest in Lot 1 to Defendant.  Hicks subsequently died.

2

## B. Lot 1 and the Property

Lot 1 adjoins the Property, and is improved by Defendant's home and a shed. The Property is an unimproved wooded lot. Leaf Lane runs adjacent to Lot 1 and the Property. Leaf Lane is a plotted road in the subdivision plan of Holly Park, but it has never been constructed. The area contained by Leaf Lane is an empty field next to Lot 1, and a wooded area next to the Property. The Property is entirely surrounded by mature, densely foliated woodlands. The Property is bounded on its western side by a drainage ditch.

## C. The Adverse Possession Timeline

The key dates in this case for purposes of the twenty-year adverse possession period are as follows. On June 18, 2001, Banks sold Lot 1 to Hicks. Banks died on May 5, 2004, and on April 4, 2005, one of his sons, Burton Evan Banks, acquired record title to the Property through inheritance from his father. On January 29, 2016, Defendant acquired sole record title to Lot 1. On September 21, 2016, Burton Evan Banks deeded the Property to himself and his co-trustee, David Michael Barrett, as Trustees of the Burton Evan Banks Revokable Living Trust.

Plaintiffs placed the Property on the market in 2021. In preparation for the sale, the prospective buyer had a survey of the Property prepared which revealed the existence of two fenced-in enclosures, one a goat enclosure created by Defendant,

3

and another enclosure created by a neighbor.[1] When Defendant was approached by Ralph Banks, Jr., the brother of Burton Evan Banks, in October, 2021, about her fenced-in goat enclosure on the Property, she stated that she would need a reasonable amount of time to procure a survey to verify the boundary line because she believed that the fence was inside the boundary line and not on the Property. However, Defendant took no subsequent action to remove this encroachment.

## II.    PROCEDURAL HISTORY

Plaintiffs filed their Complaint for Ejectment against Defendant on November 15, 2021. Defendant filed her Response on December 13, 20201, and then filed a Motion to Amend Answer and Counterclaim for Adverse Possession on March 23, 2022.  Plaintiffs did not oppose this motion, and I granted it on April 13, 2022. Plaintiffs filed their Reply to the Counterclaim on April 15, 2022. The parties conducted discovery. Plaintiffs filed a Motion for Summary Judgment on September 28, 2022, and Defendant filed a Cross Motion for Summary Judgment (on the adverse possession claim) on October 17, 2022. On October 19, 2022, I received a letter from Plaintiffs' counsel requesting that Defendant's Cross Motion for Summary Judgement be treated as an Answer to Plaintiffs' Motion for Summary Judgment, and that Plaintiffs' Motion for Summary Judgment be treated as

---

[1] The second enclosure, adjacent to the lands of Robert J. Fehre, Jr., was removed pursuant to the settlement of a separate lawsuit, *Banks v. Fehre*, CA No: S21C-11-013 CAK.

Plaintiffs' Answer or Reply to Defendant's Cross Motion for Summary Judgement. Defendant did not object. I denied the Motions for Summary Judgment orally. The parties submitted a Pretrial Stipulation on November 2, 2022, which I signed on November 7, 2022. The matter was tried before me on December 7. 2022, and I visited the Property for a visual inspection on December 8, 2022. I asked the parties to submit their closing arguments in writing, which they both did on December 20, 2022.

This is my decision after trial. Because by a preponderance of the evidence I find open and notorious, hostile, and adverse, and exclusive use of the Property by Defendant, and actual and continuous possession of the Property by Defendant, for the twenty-year statutory adverse possession period,[2] and finding no assertion of ownership or control by Plaintiffs during that period, I quiet title to the Property in Defendant. I also deny Plaintiffs' Complaint for Ejectment. My reasoning is explained below.

### III. STANDARD OF PROOF

Delaware's adverse possession statute[3] does not prescribe a standard of proof. On several earlier occasions, the Court of Chancery had indicated that the standard is, or might be, clear and convincing evidence.[4] Delaware law requires proof of an

---

[2] 10 *Del. C.* § 7901.
[3] 10 *Del. C.* §§ 7901-7904.
[4] *See, e.g, Lowry v. Wright,* 2006 WL 1586371 (Del. Ch. June 5, 2006); *Acierno v. Goldstein,* 2005 WL 3111993 (Del. Ch. Nov. 16, 2005); *Johnson v. Bell,* 2003 WL 23021932

easement by prescription by clear and convincing evidence.[5] However, clear precedent of the Delaware Supreme Court[6] and subsequent Court of Chancery cases[7] require application of the normal evidentiary standard of preponderance of the evidence to adverse possession cases. Although it might seem incongruous to require proof of a prescriptive easement by clear and convincing evidence, while only requiring proof by a preponderance of the evidence to work a forfeiture of title by adverse possession, *Phillips v. State* and its Chancery Court progeny like *Ayers v. Pave It* remain controlling Delaware law. As such, I will apply the preponderance of the evidence standard to Defendant's claim that she has acquired title to the Property by adverse possession. I need not determine whether Defendant satisfies the higher clear and convincing standard.

Defendant initially bears the burden of proving adverse possession by a preponderance of the evidence. If she carries that burden, the burden of proof then shifts to Plaintiffs to establish that the possession or use was permissive.[8]

## IV. THE EVIDENCE

The trial of this case elicited widely divergent testimony and other evidence

---

(Del. Ch. Dec. 11, 2003); *Miller v. Steele,* 2003 WL 1919332 (Del. Ch. Apr. 11, 2003).
[5]*Lickle v. Diver, Inc.,* 238 A.2d 326, 329 (Del.1968); *Cartanza v. LeBeau,* 2006 WL 903541 (Del. Ch. Apr. 3, 2006).
[6] *Phillips v. State ex. rel. Dep't of Natural Res.,* 449 A.2d 250, 255 (Del.1982).
[7] *Ayers v. Pave It, LLC*, 2006 WL 2052377, at *2 (Del. Ch. July 11, 2006); *Dickerson v. Simpson,* 792 A.2d 188 (Del. 2002); *Edwards v. Estate of Muller,* 1993 WL 489381 (Del. Ch. Oct. 18, 1993); *Cox v. Lakshman,* 1989 WL 34984 (Del. Ch. Apr. 13, 1989).
[8] *David v. Steller*, 269 A.2d 203, 204 (Del. 1970).

6

from Plaintiffs and Defendant, and thus calls on me as the trier of fact to weigh the parties' credibility. A complicating factor, as discussed above, is that Burton Evan Banks did not acquire record title until 2005, and Defendant and Plaintiffs did not acquire record title to Lot 1 and the Property, respectively, until 2016. Thus, a considerable portion of the testimony and other evidence from both parties does not relate to time periods when they were in ownership, but rather to actions of their predecessors in interest (Banks and Hicks), who are both deceased. Therefore, we have no direct evidence from these predecessors of the use of the Property, but only the testimony of their successors and the relatively few pieces of physical evidence that are available.[9] During the early years of the adverse possession timeline, Defendant was a minor living with the owner, Hicks, and her family on Lot 1. Only in later years did she raise her own children there and, as an adult owner in 2016, continue to use the Property. During the early years of the adverse possession timeline, Burton Evan Banks had not yet inherited the Property from his father, and only occasionally visited the Property. After Plaintiffs acquired the Property in 2016, they only made occasional "drive by" visits to the Property.

A. Defendant

Defendant, having the burden of proof on her Counterclaim on the adverse possession issue, presented her case first. She testified that her family lived about a

---

[9] There is no evidence of record of any adversity between the original owners. The record does show that there was an ongoing business relationship between them, because Banks financed the sale of Lot 1 to Hicks with a purchase money mortgage that was satisfied in July 2002.

7

mile from Lot 1[10] when her mother, Hicks, purchased Lot 1 in June, 2001.[11] Defendant was on summer vacation from school during the summer of June 2001 to August 2001, and her parents had a large storage shed delivered and placed on Lot 1 before their house was built, because it was easier to place the shed on Lot 1without a house in the way.[12]

Because Defendant was on vacation from school during June 2001 to August 2001, she and her parents visited Lot 1 frequently and she helped her parents assemble and install a chain link fence and a dog kennel on the Property, and cleared brush and limbs up to the fence line.[13] This fenced-in area has also changed location slightly over time and has been used for chickens in 2004,[14] and when I visited the Property on December 8, 2022, the fenced-in area, which had been extended in 2015,[15] was being used for goats.

In the summer of 2001, Defendant and her parents also moved building materials, including fencing and lumber, yard maintenance equipment, including a riding lawn mower and a rotor-tiller, and a table saw on to the Property for storage.[16]

Once the shed was placed on Lot 1, the fencing was installed and other outside

---

[10] Transcript of Bench Trial 52:6, Dkt. No. 38 [hereinafter Trial Tr.].
[11] Trial Tr. 51:13-15.
[12] *Id.* 51:20-23, 52:1-2.
[13] *Id.* 51:15-20.
[14] *Id.* 75:1-4.
[15] *Id.* 75:15-16.
[16] *Id.* 52:3-14.

items were moved to the Property, Defendant's family placed a mobile home with a cinderblock foundation on the Property in August of 2001. The Defendant's house was occupied the first week of September, 2001.[17]

Defendant testified that, when her family began using the Property in June of 2001, there was a sawmill present approximately 15 feet behind the shed.[18] The sawmill was old and rusty, covered in a worn tarp, and not in usable condition.[19] Defendant's father, Jack Hicks, replaced the tarp and covered it with a new one in the summer of 2001, but otherwise never used the sawmill.[20] From June of 2001 to the present, no one other than Jack Hicks – including Plaintiffs -- ever demonstrated ownership of the sawmill.[21] Defendant never saw or heard anyone operate the sawmill, or any evidence of its use such as sawdust, cut boards, cut trees, or disturbed ground. According to Defendant, no one ever drove on the Property or used any part of it as a roadway, and Defendant never saw any evidence of anyone driving on the Property such as tire tracks. Jack Hicks sold the sawmill on the online classified website Craigslist in May of 2012 with Defendant's assistance.[22] No one came looking for the sawmill, inquired about its whereabouts, or otherwise dealt

---

[17] *Id.* 53:5-6.
[18] *Id.* 53:20-23.
[19] *Id.* 55:11-19, 56:1-2.
[20] *Id.* 57:5-7.
[21] *Id.* 57:11-13.
[22] *Id.* 57:13-14.

with the sawmill, except Jack Hicks.[23] When I visited the Property on December 8, 2022, the sawmill itself was gone, and I was informed that the wooden beams on which the sawmill had once rested were incorporated into the goat houses, which I saw.

Defendant and two witnesses testified about the activities conducted in the back yard. The exact location of these activities in relation to the boundary line between the Property and Lot 1 is not established in the record. Her brother testified to having a pull-up bar between the shed on Lot 1 and the sawmill, which could have been on either on Lot 1 or on the Property.[24] Her childhood friend simply testified that they frequently played in the "back yard" portion of the Property, without specifying what portion of the Property that was.[25]

On the Property beyond the northeast corner of the present fence line, Defendant began to place old household items to create a children's play area or "fort" starting in the summer of 2001, and she introduced photographs of her young children playing there.[26] In my site visit, I saw this play area, in a state of disrepair.

In both her own direct testimony and on cross examination by counsel for Plaintiffs, Defendant testified that she had given a neighbor permission to use a

---

[23] *Id.* 63:19-23.

[24] *Id.* 90:1-98:19.
[25] *Id.* 84:8-88:19.
[26] *Id.* 59:12-23.

portion of the Property for a dog kennel, which he then fenced in.[27] At that time she assumed she owned the portion of the Property which he fenced in.[28] As discussed above, the neighbor, who has since died, removed this fence in settlement of a separate ejectment action by Plaintiffs.[29] Defendant argues that this action indicates she believed and acted as if the Property were hers. When I questioned Defendant in court, she testified that she never spoke to her parents and obtained an understanding of where the boundary line between Lot ! and the Property was located. She thought Lot 1 was where her house was, and the Property was her back yard that extended to Lots 3 and 4.[30]

Defendant testified that no one besides her family and guests have ever been present on the Property since June of 2001, nor has there been any evidence of the use of the Property by anyone else since June of 2001.[31] Her family has continuously chopped wood for fires, trimmed trees, cut and removed fallen trees, mowed and cleared brush, cut and used walking trails throughout the entire Property, maintained fencing and houses for animals (including a dog, chickens, and goats), used the Property for recreation, as well as other activities consistent with normal

---

[27] *Id.* 41:7-16.
[28] *Id.*
[29] The second enclosure, adjacent to the lands of Robert J. Fehre, Jr., was removed pursuant to the settlement of a separate lawsuit, *Banks v. Fehre*, CA No: S21C-11-013 CAK
[30] Trial Tr. 80-16-81-4.
[31] *Id.* 64:5-8.

use of a back yard continuously from the summer of 2001 until the present.[32]

Defendant testified repeatedly that no one has ever accessed the Property, or asked about it, during the twenty-year period beginning in 2001.[33]

B. Plaintiffs

Ralph Banks, Jr. ("Banks Jr."), Banks' son and the executor of his estate, testified that Banks owned a portable sawmill, which was stored under a tarp on wooden beams, which was located on the Property behind Defendant's house, close to the boundary line with Lot 1, and clearly visible from Lot 1.[34] He identified the sawmill and with a tarp on top of it in an aerial photograph on the Property.[35] The sawmill was accessed by the undeveloped Leaf Avenue and there was a worn path through the trees on the Property from Leaf Lane to the site of the sawmill.[36] On my site visit on December 8, 2022, I could make out vestiges of this path. Although the record does not establish exactly where the sawmill was located in relation to the boundary line, it is undisputed by the parties that the location of the sawmill did not change. Banks Jr. testified that he and Banks regularly used the sawmill from 2001 up until a month or two before Banks' death on May 5, 2004.[37] They visited the

---

[32] *Id.* 61:16-19.
[33] *Id.* 66:2-5.
[34] *Id.* 118:21-22.
[35] *Id.* 128:2-12.
[36] *Id.* 128:13-129:12.
[37] *Id.* 117:5-8

12

Property frequently on weekends in his pickup truck with chainsaws and culled out trees and gathered firewood.[38] Banks Jr. testified in response to my questions in court that these sessions lasted several hours and were quite noisy, and that he would have expected Defendant and her family to hear them.[39] Banks, Jr. testified that from 2001 until 2004, when he and Banks visited the sawmill on the Property, they never saw Defendant or her family,[40] a chain link fence enclosing a dog shelter on the Property,[41] or the play area on the Property.[42]

Banks Jr. testified that, after his father's death in 2004, he continued to visit the sawmill on the Property at least monthly, and on those visits he never saw a chain link fence or any enclosed livestock or pets on the Property.[43] He mowed a portion of the Property every two weeks in season and never saw a dog kennel or a goat enclosure.[44] In fact, Defendant had asked Banks Jr. if she could let her horses graze on the Property; he had said no.[45] Although he could not get the sawmill to function, he regularly checked on the sawmill and some stacks of firewood on the Property.[46] He was surprised by the eventual disappearance of the sawmill in 2012 and did not

---

[38] *Id.* 117:15-18.
[39] *Id.* 151:1-17.
[40] *Id.* 151:18-22.
[41] *Id.* 121:3-12.
[42] *Id.* 121:13-18.
[43] *Id.* 122:10-21.
[44] *Id.* 134:14-23.
[45] *Id.* 124.20-125.10.
[46] *Id.* 121:23-122:13.

know who had taken it.[47]

Banks Jr. testified on direct examination that his family never cleared fallen trees from the Property after storms,[48] and on cross examination he testified that his family had never posted no trespassing signs or other indicia of ownership, or paid anyone to maintain the Property or clean up fallen or storm damaged trees.[49]

David Michael Barrett, one of the Plaintiffs ("Barrett"). testified that he and his spouse, Burton Banks, were both present on the Property for 30 – 35 minutes about one week before Christmas in 2001, when Banks showed them his new sawmill in operation.[50] There was a worn path from Leaf Lane to the sawmill,[51] and they saw no chain link dog enclosure or play area.[52] Plaintiffs introduced three photographs which Barrett testified he took on in December, 2001.[53] The operation of the sawmill that day was quite loud.[54]

Barrett had done research and found that Banks had obtained a building permit on September 13, 2001to build a new pole shed at his residence; he used the sawmill for this in the fall and spring of 2001-2002.[55] There was also testimony that Banks

---

[47] *Id.* 123:6-124:19.
[48] *Id.* 135:16-136:7.
[49] *Id.* 138:5-23.
[50] *Id.* 159:5-12.
[51] *Id.* 162:2-6.
[52] *Id.* 164:7-16.
[53] *Id.* 16511-166:18.
[54] *Id.* 168:22-23.
[55] *Id.* 174:16-176:4.

was using the sawmill to make a maple table for a friend.[56]

Barrett testified that after 20005 he and his spouse Burton Banks made annual "drive by" visits to the Property over the years when they were visiting Rehoboth Beach, Delaware from their home in Atlanta, Georgia, primarily in the summer when there is thick foliage.[57] However, on cross examination Barrett could produce no airline tickets, hotel reservations, or other evidence of these visits.[58]

On cross examination Barrett stated that Plaintiffs had never maintained the Property, cleaned up fallen trees, or cleared brush on the Property because they did not believe that it was necessary for an unimproved, wooded lot, and that they had not posted no trespassing signs or introduced themselves to any of the neighbors.[59] Barrett stated that Plaintiffs never observed any activity on the Property, or any improvements, dog pen, fences, or play area on the Property.[60] The only clearing they saw on the Property was the area around the sawmill, consistent with the prior use of the sawmill, and a path leading from Leaf Lane to access that clearing.[61]

Burton Banks testified that he had grown up on the Property and had explored it as a child.[62] No other neighbors (other than Fehre and Defendant) had ever

---

[56] *Id.* 138:2-4.
[57] *Id.* 182:5-21.
[58] *Id.* 182:18-23.
[59] *Id.* 183:1-8.
[60] *Id.* 183:911.
[61] *Id.* 189:7-15.
[62] *Id.* 193:20-23.

encroached on the Property.[63] He corroborated Barrett's testimony that in December 2001 he and Barrett visited the Property to observe his father Banks operate the sawmill.[64] The sawmill appeared to be new, and was very loud.[65] Like Barrett, he referred to the photos that either he or Barrett had taken of the event.[66] His father had obtained a building permit, which he introduced to build a structure on his father's lot variously referred to as a shed, a four-bay garage, and a pole barn.[67] The pile of logs on the Property were being used by his father for this purpose. Burton Banks testified repeatedly on both direct and cross examination that, at all times he had been on the Property, he never saw a dog pen, a chain link fence enclosure, a play area, or any other structures or improvements on the Property.[68] In fact, the fence would have been right where the sawmill was located.[69] The Property was densely wooded with underbrush; the only clear area was a path from the Leaf Lane entrance to the Property through the trees to the sawmill.[70]

After his father's died intestate on May 5, 2004, Burton Banks and his two brothers agreed on how the three brothers would apportion his father's subdivided

---

[63] *Id.* 220:16-18. 3
[64] *Id.* 194:7-196:8.
[65] *Id.*
[66] *Id.*
[67] *Id.* 199:7.
[68] *Id.* 200:16-201:1.
[69] *Id.* 215:1-13.
[70] *Id.* 200:12-14.

lots.[71] He took the least desirable lot, which was landlocked.[72] He walked the Property with Barrett in 2004 and 2005 to check out the Property which he was getting.[73]  At this time he saw that the sawmill was still there.[74] At that time, he was concerned about a lot of trash, junk and debris that he saw on Lot 1 which would make it more difficult for him to sell the Property.[75]  On this visit Defendant's brother saw Burton Banks on the Property and confronted him, but he was satisfied when Burt Banks explained who he was.[76] After his father's death, Burton Banks confirmed that the document which stated there were no encroachments on the Property was an appraisal – not a survey.[77] It did not locate the boundary line between Lot 1 and the Property.[78]

After the 2004 – 2005 visits, Burton Banks and Barrett only did their annual drive-by inspections of the Property.[79]  He confirmed that they did not maintain the Property, clear fallen trees, or check on the Property after storms.[80] They never installed no trespassing signs on the Property or introduced themselves to the neighbors as the new owners of the Property.[81]

---

[71] *Id.* 201:16-203:14.
[72] *Id.*
[73] *Id.*
[74] *Id.* 203:17.
[75] *Id.* 206:10-18.
[76] *Id.* 204:9-205:17.
[77] *Id.* 227:18-228:11.
[78] *Id.*
[79] *Id.* 207:19-208:18.
[80] *Id.* 233:12- 234:4.
[81] *Id.* 234:5-16.

In 2010, a tree from the Property fell on a neighbor's property. The neighbor contacted Burton Banks, had the tree removed, and was reimbursed by Burton Banks.[82] Another neighbor complained about a den of foxes in a woodpile on the Property, which Burton Banks remedied.[83]

After Banks' death, none of his three sons wanted the sawmill.[84] When Burton Banks discovered that the sawmill disappeared in 2012, he assumed that his Uncle Pete – who was a lumberman – had taken it.[85]

Burton Banks placed the Property on the market in 2021. In preparation for the sale, the prospective buyer had a survey of the Property prepared which revealed the existence of two encroachments, which caused the purchaser to back out of the sale.[86] Burton Banks testified that in September, 2021 when he visited the Property it was overgrown and he could not see the encroachments, but on October, 2021 the Property had been partially cleared, leading him to believe that Defendant had only recently cleared the Property.[87]

## V.    ANALYSIS

There is no dispute that Plaintiffs hold record title to the Property. The only issue is whether Defendant has acquired title to the Property by adverse

---

[82]*Id.* 209:2-210:2.
[83] *Id.* 211:9-14.
[84] *Id.* 203:17-204:8.
[85] *Id.*
[86] *Id.*  219:22-220:6.
[87] *Id.* 235:18-236:15.

possession. To quiet title by adverse possession, Defendant must show by a preponderance of the evidence that she used and possessed the Property, in a manner open and notorious, exclusive, and hostile and adverse, for a continuous statutorily prescribed twenty years.[88] In my view, Defendant has satisfied each of these elements by a preponderance of the evidence. I address each element below.

A.    Open and Notorious Use

"Open and notorious means that the possession must be public so that the owner and others have notice of the possession. If possession was taken furtively or secretly, it would not be adverse and no title possession could be acquired."[89] The question is whether Plaintiffs and the public would be on inquiry notice that Defendant was in possession of the Property.

There is no evidence that Defendant and her family possessed all or part of the Property furtively or secretly. They used the Property openly and notoriously so that both Plaintiffs and the public at large in Ocean View, Delaware could have seen the fencing, the animal enclosures, the children's play area, building materials, yard maintenance equipment, walking trails, etc.

Yet neither Plaintiffs nor their witnesses claim they have never seen these

---

[88] *Tumulty v. Schreppler*, 132 A.3d 4, 23–24 (Del. Ch. 2015) (quoting *Taraila v. Stevens*, 1989 WL 110545, at *1 (Del. Ch. Sept. 18, 1989)).
[89] *Tumulty*, 132 A.3d at 27 (quoting *Walker v. Five N. Corp.*, 2007 WL 2473278, at *4 (Del. Super. Ct. Aug. 31, 2007)) (internal quotations omitted).

indicia of adverse ownership. In my view, the December, 2001 visit to the sawmill or even an occasional or sporadic inspection of the Property would have revealed Defendant's possession of at least a portion of the Property. During my site visit on December 8, 2022, Lot 1 and the Property appeared to be relatively small and contiguous, and both Lot 1 and the encroachments by Defendant on the Property were clearly visible from the Property. Yet Plaintiffs never asked Defendant about her use and possession of the Property, or posted signs or other warnings on the Property boundary line advising Defendant or other persons to keep off the Property, or introduced themselves to neighbors as the new owners of the Property.

I therefore give Defendant's testimony and other evidence more weight than that of Plaintiffs on this element.

B.    Hostile and Adverse Use

"A hostile claim goes against the claim of ownership of all others, including the record owner."[90] This element simply requires Defendant to use the property "as if it were [her] own, to the exclusion of all others."[91]

Defendant's use of the Property is clearly hostile and adverse to Defendant's legal ownership of record, as well as others. After all, she is asking me to divest Plaintiffs of ownership of record of some or all of their Property, a draconian result.

---

[90] *Id.* (quoting *Ayers v. Pave It, LLC*, 2006 WL 2052377, at *2 (Del. Ch. July 11, 2006)) (internal quotations omitted).
[91] *Id.*

She testified that she used the Property as her own, for the sole benefit of herself, her family, and her guests, and that she so used it to the exclusion of Plaintiffs or any others. There is no significant evidence to the contrary, other than Plaintiffs' testimony that they never saw such use of the Property by Defendant.

Defendant further testified that she and her family never saw or heard Plaintiffs, their family or their guests, or others on or using the Property, including the sawmill. Plaintiffs and their witnesses only offered evidence of the December, 2001 visit to the sawmill, their 2004-2005 walk through of the Property, and several other visits to the Property, as well as the annual "drive bys" after 2005. There was no evidence that Plaintiffs used the Property as their own or sought to exclude Defendant from her use of the Property.

I therefore give Defendant's testimony and other evidence more weight than that of Plaintiffs on this element.

C.      Exclusivity

The "exclusivity" element of adverse possession requires that Defendant show "exclusive dominion over the land and an appropriation of it to his or her benefit."[92] Defendant must have acted as if she were the owner of the Property. This, however, does not require "absolute exclusivity."[93] The fact that others sometimes use the

---

[92] *Id.* at 26.
[93] *Id.*

Property does not necessarily void the exclusivity element.

Plaintiffs argue that the act of using the sawmill and storing it under a tarp on large beams on the Property near the Lot 1 boundary line constituted a demonstrable, continuous, unambiguous act of dominion, control, and ownership of the Property and that, conversely, Defendant's failure to remove the sawmill until 2012 is inconsistent with any claim of her exclusive use of the Property. If the sawmill was located on any land the Hicks family believed was theirs, there is no evidence of record that they ever mentioned it to Banks, let alone complained about it or asked that it be removed. Plaintiffs argue that it is implausible that, having just bought Lot 1 from Banks on which to build a house, the Hicks family would have tolerated his leaving a piece of equipment like the sawmill on what they believed was their property. Defendant offered no rebuttal of this argument.

Plaintiffs and their witnesses also testified that Banks regularly used the sawmill up until a month or two before his death on May 5, 2004. In the fall and spring of 2001-2002, they offered to corroborate their testimony that he used the sawmill to cut boards for a structure he was building at his residence by with a building permit he obtained for his residence on September 13, 2001. Plaintiffs themselves both testified that they were present about one week before Christmas in 2001, when Banks showed them the sawmill in operation on the Property, and that they were present on the Property on other occasions as well. But Defendant testified

that she never saw or heard these events of using the sawmill, and argues that Plaintiffs' testimony contradicts their responses to Interrogatories and is vague and uncorroborated as to time.

It is hard to believe, although possible, that Defendant and her family would not have heard the sawmill being used. However, even if Plaintiffs *were* at the sawmill on the Property in December, 2001, in 2004-2005, and at other times, in my view this does not defeat this element of adverse possession since Defendant's exclusive use of the Property need not be absolute.

I therefore give Defendant's testimony and other evidence more weight than that of Plaintiffs on this element.

D. Actual Possession

"The requirement of actual possession overlaps to a large extent with open and notorious possession:"[94]

> As a general rule it will be sufficient if the land is so used by the adverse claimant as to apprise the community in its locality that it is in his exclusive use and enjoyment, and to put the owner on the inquiry as to the nature and extent of the invasion of his rights and this is especially true where the property is so situated as not to admit of permanent improvement. In such cases, *if the possession comports with the usual management of similar lands by their owners, it will be sufficient.*[95]

As discussed above with respect to the element of open and notorious possession, in

---

[94] *Id.* at 30.
[95] *Marvel v. Barley Mill Rd. Homes*, 104 A.2d 908, 912 (Del. Ch. 1954) (emphasis supplied).

my view Defendant's use of the Property was adequate to apprise the community of Ocean View, Delaware that the Property was in her exclusive use and enjoyment, so as to put Plaintiffs on inquiry notice as to the nature and extent of the invasion of their ownership rights. Defendant's possession of the Property comported with the usual management of back yards by owners of improved property, and was therefore sufficient.

I therefore give Defendant's testimony and other evidence more weight than that of Plaintiffs on this element.

E.    Continuity of Possession

The remaining issue is whether the adverse possession was continuous for the statutory period of twenty years.

As discussed above, Plaintiffs and their witnesses testified that Banks regularly used the sawmill up until a month or two before his death on May 5, 2004, well within the twenty-year adverse possession period. They offered to corroborate their testimony that in the fall and spring of 2001-2002 he used the sawmill to cut boards for a structure he was building at his residence with a building permit he obtained for his residence on September 13, 2001. This would also be within the twenty-year adverse possession period. Plaintiffs themselves both testified that they were present about one week before Christmas in 2001, when they took photographs of Banks operating the sawmill on the Property, and that they were present on the

Property in 2005-2005 and on other occasions within the twenty-year adverse possession period. Plaintiffs argue that, even if this does not defeat the exclusivity element, as discussed above, it tolls the running of the adverse possession period.

Plaintiffs argue that the first credible evidence of adverse use of the Property was in 2012, when the sawmill, which rested on heavy wooden beams, was disposed of by Defendant and her father Jack Hicks and the beams were recycled into a goat shelter, where they remain today. Even if the use of the Property by Defendant gradually increased after 2012, argue Plaintiffs, such use does not satisfy the twenty-year adverse possession period.

Defendant, on the other hand, testified that she never saw or heard the use of the sawmill, and argues that Plaintiffs' testimony contradicts their responses to her Interrogatories and is vague and uncorroborated as to time. I give Defendant's testimony and other evidence more weight than that of Plaintiffs on this element. In my view, Defendant had proved that she and her family began their adverse use of the Property in June, 2001, and have continued to do so until the Complaint for Ejectment was filed and beyond.

**************

In summary, I find that Defendant has proved each element of adverse possession by a preponderance of the evidence. The burden of proof then shifted to Plaintiffs to establish that the possession or use was permissive by a preponderance

of the evidence. There is no such evidence on the record.

The Property as I viewed it on December 8, 2022, contained trees, scrub brush and bushes. To me there appeared to be walking paths cut out of the portion of the Property further away from Defendant's home on Lot 1, consistent with her claims. Her use of the Property is consistent with its nature as it exists. Her use was much more intense in the portion of the Property closer to her home on Lot 1. The dog pen, chicken coop and goat enclosure are all in the area immediately behind Defendant's house.

I considered whether the evidence supported adverse possession of only a portion of the Property. Ultimately, I rejected that idea after viewing the area. Both Lot 1 and the Property are relatively small. Cutting the Property in two would have left a recorded lot in a position where it was likely unusable. More importantly, to me the evidence supports Defendant's claim that she used the entirety of the Property. Although the use of the portion of the Property further away from Defendant's home on Lot 1 may have been lesser, it was consistent with the nature of the Property.

### III. CONCLUSION

For the reasons discussed above, title to the Property is quieted in Defendant. Defendant shall, at her own expense, but with review by Plaintiffs, prepare documents of title consistent with this Opinion. The parties should submit to me a

form of Order consistent with this Opinion.

**IT IS SO ORDERED.**

/s/ Craig A. Karsnitz

cc:     Prothonotary